Hon. PIERRE ADOLPHE ROST, ⎫ *Associate Justices.*
Hon. ISAAC T. PRESTON, ⎭

### THE STATE *v.* JONAS and SAM, Slaves.

The act of June 1st, 1846, for the trial of slaves, is not unconstitutional. The 81st article of the Constitution provides for the vesting of criminal jurisdiction in justices of the peace by the Legislature. There is no conflict between that article and the 78th article of the Constitution.

The true ground upon which confessions of persons accused of crime, which have been extorted by violence, or induced by promises, are excluded from evidence, is, that the violence and hope destroy all confidence in the confessions. Upon true principle, the objections should go rather to the credit of the confessions, than to their admissibility as evidence. If they be obtained, under such circumstances, as to force the belief they are true, they ought to be received as evidence.

APPEAL from the Court of Justices of the Peace in the Parish of Caddo. *J. C. Beall* and *John Woods,* Justices. *John S. Gilbert,* district attorney, for the State. *B. L. Hodge* and *Thomas T Land,* for prisoners. The judgment of the court was pronounced by

PRESTON, J. The prisoners were accused of the murder of *William Boseman,* in the parish of Caddo, on the 7th of December, 1850. They were tried by a tribunal, composed of two justices of the peace and ten slave owners, residents of the parish where the crime was committed, were found guilty and sentenced to death. They have appealed.

It is first urged, that the act of the 1st of June, 1846, organizing the tribunal for their trial, is unconstitutional. If so, a serious question would arise, whether an appeal would lie from the decisions of the tribunal to this court.

We have no doubt, however, of the constitutionality of the law and of the tribunal organized by it. The 81st article of the Constitution provides, that justices of the peace shall have such criminal jurisdiction as shall be provided by law.

---

* Hon. THOMAS SLIDELL, J., was not present during the term.

STATE
*v.*
JONAS.

By the act of 1846, the Legislature has charged the first district court of New Orleans, assisted by slave owners, with the trial of slaves accused of capital crimes perpetrated in the parish of Orleans. In other parishes, it confides that jurisdiction to two justices of the peace of the parish, assisted by the slave-owners. There is no conflict between articles 78 and 81 of the Constitution, as contended.

That the Legislature have the power, under the article of the Constitution cited, to confer the jurisdiction upon the justices of the peace, can no more be doubted than the constitutionality of the exercise of it by the district court. Now, in both cases, the humanity of the law has provided, that slave-owners shall assist these judicial tribunals in the trials, just as juries are provided by the Constitution and laws to assist the courts in the trial of free persons accused of crimes.

So, under the Old Constitution, the judiciary power of the State was vested in a Supreme Court and inferior courts. The judges were all to be commissioned by the governor; and, yet, tribunals organized, as the present tribunal, were always charged with the trial of slaves. This acquiescence in the constitutionality of legislation for forty years is conclusive, *communis error facit jus.*

The following bill of exceptions was taken on the trial: "Be it remembered, that upon the trial of the above named slaves, the district attorney of the Seventeenth Judicial District of this State, in behalf of the State, introduced and offered *Samuel Hollingsworth* as a witness for the prosecution, who, after being sworn, testified as follows, to wit: That, on the 8th day of December, A. D. 1850, *William Boseman*, a citizen of this parish, was found dead near a path in the woods, not far from his residence, having been shot with the contents of a gun, viz, four or five leaden slugs; and that the friends of the deceased, on the next day after the body of *Boseman* was found, started in pursuit of the murderers with dogs; and, on the second day of the pursuit, after following the trail of the supposed murderers "from the spot where the body was found," several miles in the direction of Shreveport, they heard that two runaway slaves had, on the second day after the murder, been apprehended near Shreveport, and committed to jail in that place; that some of the company, viz., witness, *Foster, Turner* and *Barton*, immediately proceeded to Shreveport, with a view of ascertaining whether the slaves, or either of them, knew any thing relative to, or were guilty of, the murder of *Boseman*; and, upon their arrival there, was informed that said slaves were at the jailor's house about a mile distant. They, then, with several citizens of Shreveport, went to the jailor's house, *Joseph Howell's*, to see the slaves above referred to, and upon their arrival there, informed the jailor, *Joseph Howell*, of their business and suspicions. *Howell* informed them, that the slaves were in a field at work, about 400 yards distant from the house, when they, viz., *Joseph Howell, H. S. Howell* and witness, went to the field where the slaves were at work: one driving a cart, the other chopping, being a few paces from each other. *Howell*, the jailor, at the request and suggestion of witness, ordered them to the house; they, the slaves, went on to the house together, followed, a short distance behind, by witness and the two *Howell's*. As they started off and walked on, witness observed to *Howell*, that he thought it was a plain case, meaning those, he believed, were the slaves that had murdered *Boseman*, judging from the peculiar manner in which one of them walked with one of his feet turned out, saying, that the track made by that foot, corresponded with the one which they had been pursuing with dogs. When they had returned to the house and joined the company they had left there, the slaves were separated some forty or fifty steps from each other, in view of each other

but not in hearing. Part of the company left with *Jonas*, and a part, viz., witness, *Foster*, *Turner* and *Barton*, went up on the hill with *Sam*. After they were thus separated, witness then questioned *Sam* as to where he came from, who he belonged to, what kind of country he had traveled through, and many other questions of similar import were asked him. In answer, he said he was from Arkansas, but could not tell much about the country he came through. In which conversation, nothing was said about the murder of *Boseman*. *Sam*, while being questioned, was somewhat sullen, and talked rather impudently. Witness not being able to get any thing out of *Sam*, went back to *Jonas*, and said to him : "This boy up here," meaning *Sam*, "says you are the rascal that goes ahead and does all the mischief that is done ;" to which, *Jonas* said, is it possible that he has told that. Witness replied, yes, that is what he says. *Jonas* then seemed to become restless, and said, I know what you want. I knew what you wanted when I saw you coming, and if two or three of you, gentlemen, will go out here with me, I will tell you all about it. *Dr. Turner* then spoke and said to him, yes, *Jonas*, you had better tell all about it. *Jonas* said he would, and asked *Turner* to see justice done him ; and upon *Turner* replying that he would, *Jonas* then picked out *Turner*, *Mr. Bryce*, and witness, who went out and sat with him on a log, a few steps off, when he made the following confession, to wit : That on Saturday, being the 7th of December, 1850, he and *Sam* had stopt about sunset on the side of a path, leading through the woods, to camp for the night, and had kindled up a fire, and were preparing to beat up some corn to eat, when they saw a white man riding towards them but a short distance off. As soon as they saw him, *Sam* told him, *Jonas*, to get the guns, which they had set up against a tree ; he got them, and handed one to *Sam* and kept the other, and stood by the fire with the gun in his hand. When the man approached them, he stopped and commenced talking with and questioning them, as to who they were, where they were from, what they were doing here, where they were going, &c. They told him, they were preparing to beat up some corn to eat. The man asked them why they did not go to some house and grind their corn, saying, there were several handmills in the neighborhood, and that he had one at his house, about a quarter or half a mile from there, and told them that they might grind their corn on his mill, if they would go along with him ; they refused to go with him, and said they did not want to go to any persons house. The man then accused them of being runaways, and said they must go with him, and that there was a company of men not far behind, who would come up if he hallooed, and make them go ; at the same time, placing his gun, which he had across the horn of his saddle before him, and primed her afresh ; and as soon as he primed his gun, he hallooed, when, almost simultaneously with the hallooing, *Sam* raised his gun and shot him. His horse instantaneously jumped to one side and ran off with the man, who fell from him about fifty or sixty yards from the spot where he was shot. Just as the horse jumped, *Sam*, who was standing close to his side, caught the man's gun as it was falling, and brought it with him to the Bayou Pierre River, and threw it in the water. As soon as the man fell, they picked up their things and left, and made their way towards Red River, and were, on the Monday following apprehended, a few miles below Shreveport, on Bayou Pierre River, by a *Mr. Cook*, as runaways, and brought to Shreveport, and committed as runaways. *Jonas* further said, that *Sam* had, a night or two "*previous to the time of his making the confession*," gone down to the place where *Cook* apprehended them, and got their guns and other things where they had concealed them, and brought and hid them in the woods near *Howell's*

residence, but that he did not know where they were. Witness further testified, that *Sam* was then brought to where *Jonas* was, and told what *Jonas* had said, and then asked about it; but he became more sullen, and refused to answer some of the questions asked him, when *Barton* took out his pocket knife, caught hold of *Sam*, and said, I can make him talk. Witness immediately checked *Barton*, and told him not to do so, that it was not right, &c. *Barton* then put up his knife, and stood aside. *Sam* did not appear to be alarmed, and was given to understand that he was not in any danger by what was said; he, however, continued sullen, and still refused to answer questions, or to tell where the guns were. Upon his refusing to tell where he had hid the guns, *Joseph Howell*, the jailor, spoke of using a handsaw and sending for a rope, and something was said by some one of the company about their ability to pay for him; nothing could be got out of *Sam* at that time. The slaves were then brought into town, where they were arrested as felons, and committed to jail for trial. On the next day, they were taken to the place on Bayou Pierre River where, they said, they had thrown the man's gun away; the slaves walking, and the person who went with them riding; *Barton* kept behind with *Sam*. When they all got to the place designated by the slaves, where they said they had thrown the gun in the water, *Barton* said to *Sam*, now sit down and tell those gentlemen all about it, which you have told me. *Sam* said, let *Jonas* tell it now; see if he don't tell you just as I have. *Jonas* then told the same story over, which he had told the day before. When *Jonas* got through telling the story, *Sam* said to *Jonas*, and you snapt your gun at the man. *Jonas* denied it, and said he had nothing to do with it, more than to'get the guns and hand one of them to *Sam*. *Sam* said to *Jonas*, you know you snapt your gun at him. *Sam* was under no fear nor threat whatever at the time, and said what he did voluntarily. Nothing had been said to either of the slaves about the murder up to the time of the confessions of *Jonas*.

To the introduction of which testimony, the counsel for the accused objected, on the grounds, that said confession was obtained by undue influences and misrepresentations, and were not shown to have been voluntary, but obtained, as aforesaid, by the exercise of improper influences; which objections were overruled by said tribunal, and said confessions permitted to be given in evidence against the accused, for the following reasons, to wit:

Because it was considered by the court, that it was clearly proved by the testimony of said *Hollingsworth*, that the confessions made, by both said slaves, were entirely voluntary; that when *Jonas* confessed, no mention had been made to him of the murder, or that any offence was charged to him; that however improper may have been the conduct of *Barton* to *Sam* on that day, he was immediately reproved by the company present, and desisted; that *Sam* was in no fear; that *Sam's* confessions were made on the next day, and were then entirely voluntary, as was shown by the testimony of said witness. Wherefore, the confessions of each prisoner were considered competent testimony against himself.

To which ruling of said tribunal, the counsel for the accused excepted, and tendered this bill of exceptions, and prayed that it be signed, and made a part of the record in this case; and it was so done, and signed by J. C. BEAL, J. P.

The true ground upon which confessions, extorted by violence or induced by promises, are excluded as evidence, is, that the violence and hope destroy all confidence in the confessions. *In favorem vitæ*, too much strictness has been observed on this subject as to free persons. Upon true principles, the objections should go rather to the credit of the confessions than to their admission as evidence. We are not prepared to say the same strictness should be observed, so

as to exclude the confessions of slaves as evidence; humanity and charity ought to be extended to them; but if their confessions are obtained without a violation of either, and under such circumstances as to force the belief that the confessions are true, they should be received as evidence. The bill of exceptions does not satisfy us, that these principles were not observed on the trial of the prisoners, and for these reasons and those given by the tribunal, we cannot say that the confessions should not have been received in evidence.

The judgment of the special tribunal for the trial of the slaves, is therefore affirmed. And the two magistrates, or either of them, if in commission, or the sheriff, if they are not, is ordered to fix another day for the execution, the day already fixed having passed.

But we would recommend, that the day for the execution of *Jonas*, be fixed at a period sufficiently remote, to enable his owner or friends, if he has any, to lay his case before the Executive and Senate, as possibly, under all the circumstances, it might be deemed advisable to commute his punishment.